## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11, Subchapter V |
| Vyera Pharmaceuticals, LLC, *et al.*,[1] | Case No. 23-10605 |
| Debtors. | (Joint Administration Requested) |

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING DEBTORS TO HONOR OBLIGATIONS TO CUSTOMERS AND RELATED THIRD PARTIES AND TO OTHERWISE CONTINUE CUSTOMER PROGRAMS; (II) GRANTING RELIEF FROM THE AUTOMATIC STAY TO PERMIT SETOFF IN CONNECTION WITH CUSTOMER PROGRAMS; (III) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS; AND (IV) GRANTING RELATED RELIEF**

Vyera Pharmaceuticals, LLC ("Vyera") and its above-captioned affiliated debtors and debtors in possession (collectively, the "Debtors"), by and through their proposed counsel, DLA Piper LLP (US), hereby submit this motion (the "Motion") for entry of an order, substantially in the form order attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to sections 105(a), 363(b), and 553 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing, but not directing, the Debtors, in their sole discretion, to maintain and administer their customer-related programs as described in the Motion (collectively, the "Customer Programs"), and honor prepetition obligations to customers related thereto, and to otherwise continue, renew replace, modify, implement, revise and/or terminate the Customer Programs in the ordinary course of

---

[1]     The Debtors in these subchapter V cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are as follows: Vyera Pharmaceuticals, LLC (1758); Oakrum Pharma, LLC (3999); SevenScore Pharmaceuticals, LLC (2598); Phoenixus AG (1091); Dermelix Biotherapeutics, LLC (4711); and Orpha Labs AG.  The Debtors' headquarters and the mailing address for the Debtors is 600 3rd Avenue, 19th Floor, New York, NY 10016.

business and consistent with past practice, to the extent requested herein, (ii) granting relief from the automatic stay to permit ordinary course setoff in connection with the Customer Programs, (iii) authorizing banks and other financial institutions (the "<u>Banks</u>") to honor and process check and electronic transfer requests related to the foregoing, and (iv) granting related relief.  In support of this Motion, the Debtors rely upon and incorporate fully by reference the *Declaration of Lawrence R. Perkins in Support of the Debtors' Subchapter V Petitions and First Day Motions* (the "<u>First Day Declaration</u>"),[2] filed contemporaneously herewith.  In further support of this Motion, the Debtors respectfully state as follows:

**JURISDICTION AND VENUE**

1.        The United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") has jurisdiction over these subchapter V cases, the Debtors, property of the Debtors' estates, and this matter under 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.        Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.        Pursuant to Rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

---

[2]        Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

4.      The statutory bases for the relief requested in this Motion are sections 105(a), 363, and 553 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1(f).

## **BACKGROUND**

**A.      General Background**

5.      On the date hereof (the "Petition Date"), each Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code and elected to proceed under subchapter V thereunder.  Additional information about the Debtors' businesses and the events leading to the commencement of these subchapter V cases can be found in the First Day Declaration, which is incorporated herein by reference.

6.      The Debtors are continuing in possession of their respective properties and are continuing to operate and maintain their business as debtors in possession pursuant to sections 1107(a), 1108, and 1184 of the Bankruptcy Code.  As of the date hereof, no subchapter V trustee has been appointed and no date has been set for a meeting pursuant to section 341 of the Bankruptcy Code.

**B.      Customer Programs**

7.      The Debtors develop and commercialize treatments that address serious and neglected diseases with high unmet medical needs.  The Debtors' main product lines are (i) Daraprim, a prescription medication for the treatment of toxoplasmosis; (ii) Vecamyl, for the management of moderately severe to severe essential hypertension and in uncomplicated cases of malignant hypertension; and (iii) Pyrimethamine, which is also a medication for toxoplasmosis (collectively the "Products").

     i.      Overview of the Pharmaceutical Supply Chain

8.      The Debtors are pharmaceutical product developers that manage the distribution of their products from the point of production to the drug wholesalers, pharmacies, hospitals and

health plan groups. The Debtors utilize Life Science Logistics, LLC and Integrated Commercialization Solutions, Inc. as third-party logistics providers, to hold the products for the Debtors until it is delivered to the Customers who distribute to the end users. The products are sold at the wholesale acquisition cost ("WAC") (the price at which the wholesale distributors acquire the products) based on the anticipated demand, future competition in the market, and the costs, rebates, and other applicable price reductions. The Debtors provide discounts to the WAC and rebates in respect to the products and the wholesale distributors are paid a distribution service fee based on a percentage of the WAC.

    ii.   The Debtors' Customers

    9.    The Debtors have ongoing distribution relationships with (i) specialty pharmacies ("Specialty Pharmacies") which buy the Products from the Debtors and dispense them directly to hospitals and patients with eligible insurance; (ii) specialty distributors ("Specialty Distributors") which distribute Products to hospitals and other eligible entities, and (iii) general distributors (the "General Distributors", and collectively with the Specialty Pharmacies and Specialty Distributors, the "Customers"), as set forth below:

| Customer Type | Vendor |
|---|---|
| Specialty Distributor | • ASD Healthcare, a division of ASD Specialty Healthcare, LLC<br>• Cardinal Health 108, LLC |
| Specialty Pharmacies | • Walgreens Specialty (via BioRidge Pharma, LLC)<br>• Optime Care Inc. |
| General Distributors | • AmerisourceBergen Drug Corporation<br>• ANDA Pharmaceuticals Inc.<br>• McKesson Corporation |

    10.    To preserve the Debtors' critical relationships with their Customers and maximize Customer loyalty, in the ordinary course of business, the Debtors provide certain incentives, discounts, and other accommodations to their Customers (collectively, the "Customer Programs"

4

and the obligations incurred thereunder, the "Customer Obligations").  The Customer Programs include Chargebacks, Administrative Fees, Prompt Pay Discounts, Product Returns, Rebate Program, Copay Card Program, Medicaid Rebates, and Medicare Part D Rebates (each as defined herein).  As explained in greater detail below, the Customer Programs utilized by the Debtors are customary in the pharmaceutical industry and essential to preserving the value of the Debtors' business.

11.     Maintaining Customer goodwill is critical to the Debtors' ongoing operations, maximization of value for stakeholder value, and ability to proceed with a plan process under subchapter V.  Indeed, absent the continuation of the Customer Programs and the setoff of prepetition obligations in connection therewith, the Debtors risk losing their direct lifeline to the marketplace.

12.     As further described below, the Debtors estimate that the aggregate value of accrued Customer Obligations is approximately $9,176,308, which remain unliquidated and contingent as of the Petition Date, and which comprise: (i) approximately $1,539,381 in accrued Chargebacks; (ii) approximately $97,027 in accrued Administrative Fees, (iii) approximately $1,471,826 in accrued Product Returns; (iv) approximately $316,758 in accrued Rebate Program payments; (v) approximately $36,083 in accrued Copay Card Program payments; (vi) approximately $3,804,048 in total Medicaid Rebates; and (vii) approximately $16,564 in accrued Medical Coverage Discount Program.

13.     Historically, the Debtors have satisfied these Customer Obligations as follows: (1) the Debtors will set off Customer Obligations against accounts receivable due and owing by the respective Customers; (2) depending on the result of such setoff, the Debtors will either (a) send an invoice to the applicable Customer for the balance outstanding or (b) remit payment to such

Customer for the balance outstanding (collectively, the "Setoff Procedures").  As set forth further below, the Setoff Procedures are standard in the pharmaceutical industry in which the Debtors operate, are vital to the Debtors' cash flow system and ability to make vendor payments thereunder and allow the Debtors to forecast out cash flow and demand.

### iii.  Chargeback Program

14.     The Debtors negotiate certain agreements (the "Chargeback Agreements") to establish contract pricing and chargebacks with their Customers.  The Chargeback Agreements govern the terms of sale of their Products by the Specialty Distributors.  Upon information and belief, the Debtors' Customers value the Chargeback Agreements and consider the arrangements to be essential and integral components of their commercial relationships with the Debtors.

15.     Based on the existence of certain Chargeback Agreements or statutory rights, the Specialty Distributors may be entitled to sell the Products to certain eligible hospitals and other eligible entities at a special discounted rate.  These include (i) memberships in Vizient purchasing organization and Apexus and (ii) hospitals with pricing letters in place, which allows the hospital to receive a direct discount from the Debtors (the "Chargeback Program").  The special discounted rate is less than the WAC that the Customers pay to the Debtors.  Thus, when the Customers sell the Products to eligible hospitals at a rate lower than WAC, the Debtors must compensate the Customers for the deficiency (a "Chargeback").

16.     After the point of sale, the Customer can submit a Chargeback request to the Debtors, which is due within seven (7) days.  The Debtors receive a daily report from the Customers detailing the Chargebacks.  Due to the Debtors' relationships with most of their Customers, the Customers typically deduct the amount of the Chargeback from future payments against outstanding accounts receivable, and the Debtors then review and honor such Chargeback deductions through the Setoff Procedures. The Customers generally maintain inventory after

6

purchase of the Debtors' products, and Customer purchases and Chargebacks are netted against each other on a highly frequent basis, it is difficult for the Debtors to determine with precision the actual amount of outstanding Chargebacks at a given point in time.

17.    The Debtors also accumulate Chargebacks under their agreement with the Centers for Medicare and Medicaid Services ("CMS").  Specifically, the Debtors must comply with the United States Department of Health and Human Services' 340B Drug Pricing Program (the "340B Program"), established under Section 340B of the Public Health Service Act.  Under the 340B Program, the Debtors must sell the Product at specified prices that reflect a substantial discount to WAC.  Failure to comply with the 340B Program may result in fines and penalties, and exclusion from other federal programs.  Certain entities, as set forth in relevant statutes, provide a minimum share of their services, set by the 340B Program regulations, to low-income patients and receive federal funds from CMS to help cover the costs of providing care to uninsured patients (such hospitals, clinics and other entities, the "340B Entities").  Pursuant to the 340B Program, the 340B Entities are entitled to receive the Products at a discounted price set by statute, which is calculated on a quarterly basis.  340B Entities purchase the Products from one of the Debtors' Customers at the discounted price, and the Customer then submits a Chargeback to the Debtors for the difference between the WAC price that the Customer paid to the Debtors and the discounted price paid by the 340B Entity to the Customer.

18.    On average, the Debtors accrue approximately $1,894,621 in Chargebacks every month (calculated from a 16-month lookback period). Chargebacks are implemented by the Customers through the Setoff Procedures and may require a cash outlay from the Debtors.  The Debtors estimate that the aggregate number of Chargebacks accrued as of the Petition Date under the Chargeback Program is $1,539,381.

EAST\200897673.7

19.     The Debtors request authority to honor, including through implementing the Setoff Procedures, prepetition and postpetition Chargebacks owed to the Customers as they come due in the ordinary course of business and consistent with past practice.  Failure to honor the prepetition Chargebacks would likely result in irreparable harm to the Debtors, including more restrictive contract terms, loss of Customer loyalty or market share, and an erosion of Customer satisfaction and goodwill.

iv.  Administrative Fees

20.     The Debtors also accumulate certain fees pursuant to agreements with the Customers for, among other things, physical stocking, packing and shipment of the Products, credit and billing processing, accounts receivables management, contracts, chargeback administration, warehouse services, logistics management, inventory management, regulatory assurance, receiving discrepancy resolution, standard operating procedures, validation management, supply control, process set-ups, process scheduling, information system management, customer and financial services, licensing, serialization, sunshine reporting, government price reporting, group purchasing organizations fees and returns management (the "Administrative Fees").

21.     The Debtors estimate that the aggregate amount of Administrative Fees accrued as of the Petition Date is $97,027.  The Administrative Fees will require a cash payment. Failure to honor the prepetition Administrative Fees would likely result in irreparable harm to the Debtors since these functions are necessary to facilitate the Customer Programs and the Debtors' operations.

v.  Prompt Pay Discount Program

22.     The Debtors also negotiate prompt pay discounts ("Prompt Pay Discounts") for product purchases by their Customers (the "Prompt Pay Discount Program").  Prompt Pay Discounts offer Customers a reduction in sales price if the Customers pay the amounts owed earlier

8

than required and within certain early payment windows. The Prompt Pay Discount Program is implemented through the Setoff Procedures and does not require a cash outlay from the Debtors. Prompt Payment Discounts are standard in the Debtors' industry, and this program incentivizes Customers to remit payments promptly.

23.    As of the Petition Date, the Debtors do not owe any amounts in unpaid Prompt Pay Discounts. The Debtors request authority to honor, including through the Setoff Procedures, the postpetition Prompt Pay Discounts as they come due in the ordinary course of business and consistent with past practice. Honoring the Prompt Pay Discounts will not require any cash payment by the Debtors, and is vital to preserving Customer loyalty and goodwill, as it demonstrates the Debtors' ability to provide the Products on competitive terms, which is especially important in the Debtors' highly competitive industry.

vi.  <u>Product Returns</u>

24.    Consistent with industry practice, the Debtors maintain a return policy that allows Customers to return products within a specified period prior and subsequent to the product expiration date (the "<u>Product Return Program</u>" and such returns, "<u>Product Returns</u>"). Though there are variations for certain Customers, generally, Customers must return Products between 3 months before to 6 months after the applicable Product expiration date. Certain exclusions apply, including, fees for processing third party returns, destruction charges, shipping costs that are non-reimbursable, and all Product Returns are subject to review and approval by the Debtors. Where a Customer processes the Product Return on behalf of the Debtors, that Customer has the ability to deduct the Product Return value directly from the Debtors' account.

25.    The Debtors review and honor such deductions by way of setoffs through the issuance of credits against then-outstanding accounts receivable. The Debtors estimate that the

aggregate amount of the Product Returns for the Products accrued and owing as of the Petition Date is approximately $1,471,826.

26.     The Debtors request the authority to honor, including through implementing of the Setoff Procedures, the prepetition and postpetition Product Returns as they come due in the ordinary course of business and consistent with past practice.  Honoring Product Returns will not require any cash outlay by the Debtors and is vital to maintaining Customer satisfaction and loyalty.  Failure of the Debtors to honor the Product Returns would likely cause Customers to purchase alternatives to the Products, resulting in decreased market share and revenues, which would ultimately adversely impact the plan process proposed in these subchapter V cases.

   vii. Rebate Program and Copay Card Program

27.     The Debtors provide rebates (the "Rebates") with respect to the utilization of certain Products by participants under an eligible plan (the "Rebate Program").  The Debtors contract with Ascent Health Services, LLC to administer the Rebate Program and provide pharmaceutical rebate purchasing services to track, calculate, invoice, collect, and allocate Rebates made available by the Debtors.  The Debtors estimate that the aggregate amount of Rebates for the Products accrued as of the Petition Date is $316,758.  Similar to the Product Returns, the Customers issuing Rebates to patients have the ability to deduct the Rebate value directly from the Debtors' account without further consent or approval from the Debtors.

28.     The Debtors also provide a copay assistance program to assist insured patients (the "Copay Card Program") to make their Products more affordable.  To operate the Copay Card Program, the Debtors maintain a prefunded copay account (the "Prefunded Account") through Eversana Life Science Services, LLC.  At the end of each calendar month Eversana delivers a monthly account statement to the Debtors setting forth the actual payments made in respect to the Copay Card Program.  In accordance therewith, the Debtors deposit the amount requested in the

10

monthly statement into the Prefunded Account within five (5) business days following receipt. The Debtors estimate that the aggregate amount payable under the Copay Card Program as of the Petition Date is $36,083.

29.     The Debtors request the authority to honor, including through implementing the Setoff Procedures, the prepetition and postpetition amounts in relation to the Rebate Program and the Copay Card Program as they come due in the ordinary course of business and consistent with past practice.  Honoring the Rebate Program and the Copay Card Program will require a cash outlay by the Debtors and is vital to maintaining Customer satisfaction and loyalty.  Failure of the Debtors to honor the Rebate Program and the Copay Card Program would likely cause Customers to purchase alternatives to the Products, resulting in decreased market share and revenues which would ultimately adversely impact the plan process proposed in these subchapter V cases.

       viii.     <u>Medicaid</u>

30.     Medicaid is a health program jointly funded by state and federal governments and managed by the states that assist low-income individuals and families in obtaining healthcare.  The Medicaid Drug Rebate Program, a federal and state partnership that offsets the costs of certain prescription medications dispensed to Medicaid patients, requires the Debtors to enter into a national rebate agreement with the Secretary of the Department of Health and Human Services.  In return, Medicaid covers the cost of the Products for eligible individuals.  States collect product utilization data for the Products paid for under the various state and federal programs and invoice the Debtors for rebates (the "<u>Medicaid Rebates</u>"), which are calculated based on a statutory formula or, for supplemental rebates, the contractual formula.

31.     The Debtors receive invoices for the Medicaid Rebates on a quarterly basis.  The Debtors estimate that, as of the Petition Date, approximately $3,804,048 in total and remain unpaid for Medicaid Rebates.  If the Debtors fail to fulfill their Medicaid obligations, including payment

of the Medicaid Rebates as they become due, they risk becoming excluded from all federal programs, as well as being subject to penalties and fines.  As such, honoring the Medicaid Rebates is integral to the Debtors' businesses.  Accordingly, the Debtors respectfully request authorization to continue making Medicaid Rebate payments in the ordinary course of business during the subchapter V cases with respect to both prepetition and postpetition sales of the Products.

ix. <u>Medicare</u>

32.    Medicare is a federally administered national insurance program that primarily serves Americans over the age of 65.  Medicare Part D provides prescription drug benefits to eligible patients.  The Debtors are party to contracts with private insurance companies, managed care organizations, and pharmacy benefit managers with Medicare Part D business lines, under which the Debtors pay certain rebates, and, in certain cases, pay administrative or other fees related to Medicare Part D ("<u>Medicare Part D Rebates</u>").  The Debtors receive invoices for these rebates and fees on a quarterly basis within 90 days of the close of the period and are due 30 days after invoice.  The Debtors have also subscribed to the Medical Coverage Gap Discount Program whereby discounts are available to eligible beneficiaries receiving applicable covered Part D drugs while in the coverage gap (the "<u>Medical Coverage Discount Program</u>"). As of the Petition Date, the Debtors estimate that they have accrued but not yet paid approximately $16,564 under the Medical Coverage Discount Program.  As at the Petition Date, the Debtors have no accrued and unpaid amounts in respect to Medicare Part D Rebates.  The Debtors respectfully request authorization to continue making Medicare Part D Rebate and Medical Coverage Discount Program payments in the ordinary course of business during the subchapter V cases with respect to both prepetition and postpetition sales of the Products.

12

## RELIEF REQUESTED

33.      By this Motion, the Debtors seek entry of an order, substantially in the form of the Proposed Order, pursuant to sections 105(a), 363(b), and 553 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (i) authorizing, but not directing, the Debtors, in their sole discretion, to maintain and administer their Customer Programs and honor prepetition obligations to Customers related thereto, and to otherwise continue, renew replace, modify, implement, revise, or terminate the Customer Programs in the ordinary course of business and consistent with past practice, to the extent requested herein; (ii) granting relief from the automatic stay to permit ordinary course setoff in connection with the Customer Programs; (iii) authorizing the Banks to honor and process check and electronic transfer requests related to the foregoing; and (iv) granting related relief.

34.      The Customer Programs allow the Debtors to meet competitive pressures, ensure Customer satisfaction, and generate Customer goodwill, thereby enhancing revenue.  Additionally, authorizing the continued used of the Setoff Procedures is vital to the continued operation of the Debtors' businesses in the ordinary course and the Debtors' ability to pursue a value-maximizing plan process under these subchapter V cases.  For the reasons set forth herein, the Debtors submit that the relief requested is in the best interests of the Debtors, their estates, creditors, and other parties-in-interest, and therefore, should be granted.

## BASIS FOR RELIEF

**A.      Section 363(b)(1) of the Bankruptcy Code and the Doctrine of Necessity authorize the Debtors to maintain and honor the Customer Programs.**

The Court may grant the relief requested herein pursuant to sections 363 and 105(a) of the Bankruptcy Code.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate." 11 U.S.C. § 363(b)(1).  Under section 363(b) of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims if a sound business purpose exists for doing so.  *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted) (requiring that debtor show a "sound business purpose" to justify its actions under section 363 of Bankruptcy Code); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).  Moreover, if "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

35.     In addition, the Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein, because such relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105; *see In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (applying section 105(a) to justify an order authorizing the payment of certain prepetition wages, salaries, medical benefits, and business expense claims to debtor's employees).  Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession" to act as a fiduciary to "protect and preserve the estate, including an operating business' going-concern value," on behalf of a debtor's creditors and other parties in interest.  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex.

14

2002)); *see also Unofficial Comm. of Equity Holders v. McManigle* (*In re Penick Pharm., Inc.*), 227 B.R. 229, 232–33 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee.").   Courts have consistently permitted payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors.  *See, e.g.*, *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the . . . [business] during reorganization, payment may be authorized even if it is made out of [the] corpus").

36.     The Court may also authorize the payment of prepetition claims in appropriate circumstances under section 105(a) of the Bankruptcy Code and the doctrine of necessity when such payment is essential to the continued operation of a debtor's business.  *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of Bankruptcy Code provides a statutory basis for payment of prepetition claims under the doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (confirming that the doctrine of necessity is standard in the Third Circuit for enabling a court to authorize payment of prepetition claims prior to confirmation of a reorganization plan).

**B.      The Court should authorize the Debtors to continue their Setoff Procedures.**

37.     The Debtors should be authorized to continue permitting setoff of amounts owed to the Debtors by Customers against credits and other payables that the Debtors owe to Customers in connection with Customer Programs in the ordinary course of business and consistent with past

practice.  A right to setoff exists where: (i) the debtor owes a debt to the creditor that arose prepetition; (ii) the debtor has a claim against the creditor that arose prepetition; and (iii) the debt and claim are mutual.  *In re Orexigen Therapeutics, Inc.*, 990 F.3d 748, 752 (3d Cir. 2021).  Setoff rights allow "entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'"  *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 19 (1995) (citations omitted).  These non-bankruptcy setoff rights are preserved in bankruptcy (subject to certain exceptions) through section 553 of the Bankruptcy Code, which states, in relevant part:

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case.

11 U.S.C. § 553.

38.    Although setoff rights are preserved under section 553 of the Bankruptcy Code, they are also subject to the restrictions imposed by section 362 of the Bankruptcy Code, which specifically stays "the setoff of any debt ow[ed] to the debtor that arose before the commencement of the case under this title against any claim against the debtor."  11 U.S.C. § 362(a).  The court may grant relief from the automatic stay "for cause."  11 U.S.C. § 362(d).

39.    Here, cause exists to grant such relief to allow (i) the Debtors to set off amounts that Customers owe to the Debtors against credits and other payables the Debtors owe in the ordinary course of business to Customers in connection with Customer Programs and (ii) allow the Customers to exercise their contractual right of setoff regarding undisputed ordinary course prepetition mutual debts outstanding consistent with past practice.  Courts have held that the existence of a valid setoff right is prima facie evidence of cause for relief from the automatic stay.

16

*In re Red Rock Services* Co., LLC, 480 B.R. 576, 616 (Bankr. E.D. Pa. 2012); *In re Ealy*, 392 B.R. 408, 414 (Bankr. E.D. Ark. 2008); *In re Nuclear Imaging Systems, Inc.*, 260 B.R. 724, 730 (Bankr. E.D. Pa. 2000).

40.    Absent the relief requested, the Debtors' operations would grind to a halt. For example, on the Petition Date, the Debtors estimate that Debtor Vyera Pharmaceuticals, LLC ("Vyera") owes approximately $14,980,652 in aggregate accounts payable to its vendor pool. However, the Debtors estimate that Vyera is owed approximately $14,737,889 in aggregate accounts receivable stemming from the same respective overall transactions. In the ordinary course, Debtor Vyera Pharmaceuticals, LLC would set off each vendor's respective accounts payable account with its respective accounts receivable account and either send an invoice or make a payment for the difference. It would be prohibitively expensive if Vyera had to pay down its liability to Cardinal Health 108 LLC, for example, while ignoring those amounts currently due and owing to Vyera.

**C.    Continuing the Customer Programs and honoring the obligations related thereto is in the best interests of the Debtors' businesses and their estates.**

41.    The relief requested by this Motion represents a sound exercise of the Debtors' business judgment, and is necessary to avoid immediate and irreparable harm to the Debtors' estates. The ability to continue administering the Customer Programs without interruption is critical to the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' stakeholders. The Debtors' business relies heavily on the ability of their Customers to distribute the Products, which ultimately goes to patients. The Debtors' direct Customers and patients have come to rely on the Customer Programs, which are consistent with industry standard and ensure that the Debtors are able to provide an uninterrupted stream of product to the marketplace. If the Debtors are unable to continue the Customer Programs or honor

17

obligations thereunder, the Debtors risk alienating certain Customers and, thereby, suffering losses in Customer loyalty and goodwill that will harm their prospects for maximizing value for all stakeholders.

42.     The Debtors respectfully submit that the benefits of continuing their Customer Programs far exceeds the costs associated with honoring these practices and obligations.  As described herein, the Customer Programs do not require any cash outlay by the Debtors and requires a setoff in the ordinary course of business which is consistent with past practices between the Customers and the Debtors.  The relief requested herein will protect the Debtors' goodwill with their Customers during this critical time in the subchapter V cases and enhance the Debtors' ability to maximize value through the proposed plan process in these subchapter V cases.

43.     Accordingly, the Debtors request that they, in their sole discretion, be authorized to (i) honor (through setoff, credit, or deduction) their Customer Obligations, whether arising prepetition or postpetition, as they deem appropriate, in the ordinary course of business and consistent with past practice; [(ii) to pay and honor certain prepetition and postpetition obligations to Medicare and Medicaid in the ordinary course of business and consistent with past practice; and] (iii) continue, renew, replace, implement new, and/or terminate the Customer Programs and any other customer practices as they deem appropriate, without further application to the Court.

**D.      The Court should authorize and direct the Banks to honor and process related checks and transfers.**

44.     By this Motion, the Debtors also request that the Court authorize all applicable Banks to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the Customer Programs, provided that sufficient funds are available in the applicable bank accounts to make such payments.  The Debtors further request that all of the Banks be authorized

to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to this Motion.

## SATISFACTION OF BANKRUPTCY RULE 6003(b)

45.     Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code or to satisfy prepetition claims within twenty-one days of the Petition Date requires the Debtors to demonstrate that such relief "is necessary to avoid immediate and irreparable harm."  As set forth throughout this Motion, the Debtors' failure to honor their Customer Programs as provided herein would likely result in immediate and irreparable harm to the Debtors' customer relations.  The Debtors' Customer Programs obligations can come due quickly, at the discretion of the Debtors' customers in most instances.  Thus, if the relief requested herein is not granted, the Debtors' failure to honor and support the Customer Programs as provided herein and satisfy the obligations related thereto would cause the Debtors' estates immediate and irreparable harm by detracting from, and potentially derailing, the Debtors' sale efforts and would substantially diminish or impair the Debtors' efforts in these subchapter V cases to preserve and maximize the value of their estates.

46.     For this reason and those set forth above, the Debtors respectfully submit that Bankruptcy Rule 6003(b) has been satisfied and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## WAIVER OF NOTICE AND STAY UNDER BANKRUPTCY RULE 6004(a) AND 6004(h)

47.     To the extent that Bankruptcy Rule 6004(a) applies, the Debtors respectfully request a waiver of such notice requirement in order to successfully implement the foregoing requested relief. The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court

EAST\200897673.7

orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their businesses without interruption and to preserve value for the estates.  Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## RESERVATION OF RIGHTS

48.     Nothing contained in this Motion is intended or shall be construed as (i) an admission as to the validity of any claim against the Debtors; (ii) impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates to dispute the amount of, basis for, nature, validity, or priority of any claim against the Debtors; (iii) impair, prejudice, waive or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action which may exist against any third party; (iv) be construed as an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between any Debtor and any third party under section 365 of the Bankruptcy Code; or (v) create any rights in favor of, or enhance the status or nature of any claim held by, any person.  Authorization to pay the claims described in this Motion should not be deemed a direction to the Debtors to pay such claims; rather, the Debtors will make any such payments in their business judgment.

## NOTICE

49.     Notice of this Motion will be provided in accordance with the Local Rules to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Delaware Secretary of State, (iii) the Office of the Attorney General of the states in which the Debtors operate; (iv) the Federal Trade Commission; (v) the United States Food and Drug Administration; (vi) the Internal Revenue Service; (vii) the Debtors' 30 largest unsecured creditors; (viii) the Banks; (ix) the subchapter V trustee (once appointed); (x) the Customers; and (xi) all others entitled to notice in

accordance with Bankruptcy Rule 2002 and Local Rule 9013-1(m). Due to the nature of the relief

sought, the Debtors respectfully submit that no other or further notice of this Motion is required.

[*Remainder of Page Intentionally Left Blank*]

**WHEREFORE**, the Debtors respectfully request entry of an order, substantially in the form of the Proposed Order attached to this Motion as **Exhibit A**, granting the relief requested herein and grant such other and further relief as this Court deems just and proper.

Dated:  May 10, 2023
          Wilmington, Delaware

Respectfully submitted,

**DLA PIPER LLP (US)**

*/s/ R. Craig Martin*
R. Craig Martin (DE No. 5032)
Matthew S. Sarna (DE No. 6578)
1201 North Market Street
Wilmington, Delaware 19801
Tel: (302) 468-5700
Fax: (302) 397-2336
Email: craig.martin@us.dlapiper.com
       matthew.sarna@us.dlapiper.com

-and-

John K. Lyons (*pro hac vice* admission pending)
444 West Lake Street, Suite 900
Chicago, Illinois 60606-0089
Tel: (312) 368-4000
Fax: (312) 236-7516
Email: john.lyons@us.dlapiper.com

*Proposed Counsel to the Debtors*

# **EXHIBIT A**

## **Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Vyera Pharmaceuticals, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11, Subchapter V<br><br>Case No. 23-10605<br><br>(Jointly Administered) |

**ORDER (I) AUTHORIZING THE DEBTORS TO HONOR OBLIGATIONS
TO CUSTOMERS AND RELATED THIRD PARTIES AND TO OTHERWISE
CONTINUE CUSTOMER PROGRAMS; (II) GRANTING RELIEF FROM
THE AUTOMATIC STAY TO PERMIT SETOFF IN CONNECTION WITH
CUSTOMER PROGRAMS; (III) AUTHORIZING FINANCIAL
INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND
TRANSFERS; AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion"),[2] filed by the above-captioned debtors (collectively, the

"Debtors") for entry of an order (this "Order") (A) authorizing, but not directing, the Debtors to

maintain and administer their Customer Programs; honor prepetition obligations to Customers

related thereto, and to otherwise continue, renew replace, modify, implement, revise and/or

terminate the Customer Programs in the ordinary course of business and consistent with past

practice, to the extent requested herein, (B) authorizing relief from the stay to permit setoff in

connection with certain customer programs, (C) authorizing financial institutions to honor and

process related checks and transfers and (D) (the "Banks") to honor and pay all checks and

transfers drawn on the Debtors' accounts related to the foregoing; all as further described in the

Motion; and upon consideration of the First Day Declaration and the record of these subchapter V

---

[1]       The Debtors in these subchapter V cases, along with the last four digits of each Debtor's federal tax
identification number, if applicable, are as follows: Vyera Pharmaceuticals, LLC (1758); Oakrum Pharma, LLC
(3999); SevenScore Pharmaceuticals, LLC (2598); Phoenixus AG (1091); Dermelix Biotherapeutics, LLC (4711);
and Orpha Labs AG.  The Debtors' headquarters and the mailing address for the Debtors is 600 3rd Avenue, 19th
Floor, New York, NY 10016.

[2]       Capitalized terms used but not otherwise defined in this Order shall have the respective meaning ascribed to
such terms in the Motion.

cases; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that (i) this Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; (ii) this Court may enter a final order herewith consistent with Article III of the United States Constitution; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A); (iv) venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and (v) no further or other notice of the Motion is required under the circumstances; and having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted in this Orde; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED, as set forth in this Order.

2.      The Debtors are authorized, but not directed, to continue, renew, replace, modify, implement, revise and/or terminate, as they deem appropriate, in their sole discretion, the Customer Programs in the ordinary course of business (and consistent with past practice), and without further order of this Court, to honor all prepetition obligations thereunder that come due, including satisfying all obligations and permitting all setoffs in connection therewith, in each case, in the ordinary course of business and in the same manner and on the same basis as if the Debtors performed and honored such obligations prior to the Petition Date.

3.      The automatic stay imposed under section 362 of the Bankruptcy Code is hereby modified for the limited purpose of effectuating the terms and provisions of this Order.

4.     The Banks are authorized, when requested by the Debtors, in the Debtors' discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations authorized to be paid hereunder, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments. The Banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Order, and any such Bank shall not have any liability to any party for relying on such representations by the Debtors, as provided for in this Order.

5.     Nothing contained in this Order is intended or should be construed to create an administrative priority claim on account of any Customer Programs.

6.     Nothing contained in this Order is or should be construed as: (i) an implication or admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any other party-in-interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors, (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (iv) a promise to pay any claim, (v) a concession by the Debtors that any liens (contractual, common law, statutory or otherwise) satisfied pursuant to the Motion are valid (and all rights to contest the extent, validity or perfection or seek avoidance of all such liens are expressly reserved), (vi) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease between the Debtors and any third party under section 365 of the Bankruptcy Code, (vii) a waiver of the obligation of any party in interest to file a proof of claim, or (viii) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.

EAST\200897673.7

7.      Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon its entry; (b) the Debtors are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this order; and (c) the Debtors are authorized and empowered, and may, in their discretion and without further delay, take any action necessary or appropriate to implement this Order.

8.      Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

9.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.