## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11, Subchapter V |
| Vyera Pharmaceuticals, LLC, *et al.*,[1] | Case No. 23-10605 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Related D.I. 11, 157, 243** |

**BRIEF OF THE DEBTORS (I) IN SUPPORT OF CONFIRMATION OF THE DEBTORS' SECOND AMENDED JOINT SUBCHAPTER V PLAN OF REORGANIZATION AND LIQUIDATION AND (II) IN RESPONSE TO THE OBJECTION OF DARAPRIM CLASS ACTION SETTLEMENT CLASS TO CONFIRMATION OF DEBTORS' AMENDED JOINT SUBCHAPTER V PLAN OF REORGANIZATION AND LIQUIDATION**

Dated: August 12, 2023

**DLA PIPER LLP (US)**

R. Craig Martin (DE No. 5032)
Matthew S. Sarna (DE No. 6578)
1201 North Market Street
Wilmington, Delaware 19801
Tel: (302) 468-5700
Fax: (302) 397-2336
Email: craig.martin@us.dlapiper.com
       matthew.sarna@us.dlapiper.com

John K. Lyons (admitted *pro hac vice*)
444 West Lake Street, Suite 900
Chicago, Illinois 60606-0089
Tel: (312) 368-4000
Fax: (312) 236-7516
Email: john.lyons@us.dlapiper.com

*Counsel to the Debtors*

---

[1] The Debtors in these subchapter V cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are as follows: Vyera Pharmaceuticals, LLC (1758); Oakrum Pharma, LLC (3999); SevenScore Pharmaceuticals, LLC (2598); Phoenixus AG (1091); Dermelix Biotherapeutics, LLC (4711); and Orpha Labs AG. The Debtors' headquarters and the mailing address for the Debtors is 600 3rd Avenue, 19th Floor, New York, NY 10016.

# Table of Contents

PRELIMINARY STATEMENT ................................................................................................5

BACKGROUND ......................................................................................................................7

ARGUMENT ..........................................................................................................................7

    I.    The Class Action Plaintiffs' asserted liens are avoidable notwithstanding contrary language in the prepetition Settlement Agreement. ...............................................................................7

    II.    The Plan satisfies the disclosure requirements of section 1190 of the Bankruptcy Code...11

      A.    The Plan complies with section 1129(a)(1) of the Bankruptcy Code...................................13

      B.    The Plan complies with section 1122 of the Bankruptcy Code. ...........................................13

      C.    The Plan satisfies the requirements of section 1123(a)(1)–(8) of the Bankruptcy Code.....15

      D.    The Plan complies with section 1129(a)(2) of the Bankruptcy Code...................................17

      E.    The Plan complies with section 1129(a)(3) of the Bankruptcy Code...................................18

      F.    The Plan complies with section 1129(a)(4) of the Bankruptcy Code...................................19

      G.    The Plan complies with section 1129(a)(5) of the Bankruptcy Code. ..................................20

      H.    Section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Plan. ............................21

      I.    The Plan complies with section 1129(a)(7) of the Bankruptcy Code...................................21

      J.    The Plan complies with section 1129(a)(8) of the Bankruptcy Code...................................22

      K.    The Plan complies with section 1129(a)(9) of the Bankruptcy Code. ..................................24

      M.    The Plan complies with section 1129(a)(11) of the Bankruptcy Code. ...............................25

      N.    Section 1129(a)(12) of the Bankruptcy Code is inapplicable to the Plan. ...........................26

      O.    Section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan. .........................26

      P.    Section 1129(a)(14) of the Bankruptcy Code is inapplicable to the Plan. ...........................27

      Q.    Section 1129(a)(15) of the Bankruptcy Code is inapplicable to the Plan. .........................27

      R.    Section 1129(a)(16) of the Bankruptcy Code is inapplicable to the Plan. ...........................27

    IV.    In the alternative, the Plan satisfies the confirmation requirements under section 1191(b) of the Bankruptcy Code and may be confirmed as a "non-consensual plan". ..................................27

    V.    The Court should approve the settlements set forth in the Plan under Bankruptcy Rule 9019. 29

    VI.    The Plan's release, exculpation, and injunction provisions are appropriate and comply with the Bankruptcy Code. .........................................................................................................29

      A.    The Debtor Release is appropriate and complies with the Bankruptcy Code....................30

      B.    The Third-Party Releases are appropriate and comply with the Bankruptcy Code..........31

      C.    The Exculpation provision is appropriate and complies with the Bankruptcy Code.........32

      D.    The Plan Injunctions are appropriate and comply with the Bankruptcy Code.................33

**VII.    The proposed assumption of executory contracts and unexpired leases under the Plan is proper.** ................................................................................................................................ 34

**VIII.    Waiver of stay of the Confirmation Order is appropriate under the circumstances.** ...... 36

**IX.    Conclusion** ................................................................................................................................ 37

# Table of Authorities

**Cases**

*Bank of Am. Nat. Tr. & Sav. As'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 (1999) ......... 21

*In re American Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012)...................................... 25

*In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987)................................................. 14

*In re Johns-Mansville Corp.*, 843 F.2d 636 (2d Cir. 1988) ......................................................... 13

*In re Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988)................................................... 18

*In re Montgomery Ward, LLC*, 634 F.3d 732 (3d Cir. 2011) ....................................................... 10

*In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985) ............................................... 18

*In re Texaco Inc.*, 84 B.R. 893, 906–07 (Bankr. S.D.N.Y. 1988).................................................. 17

*In re Trans World Airlines, Inc.*, 261 B.R. 103, 115 (Bankr. D. Del. 2001) ................................ 10

*In re Tribune Co.*, 972 F.3d 228, 232 (3d Cir. 2020)................................................................... 27

*In re Armstrong World Indus., Inc.*, 348 B.R. 136, 162 (D. Del. 2006) ...................................... 34

*In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) ...................................................... 30

*In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006)................................................ 31

*In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) ................................... 29

*NLRB v. Bildisco & Bildisco (In re Bildisco)*, 682 F.2d 72, 279 (3d Cir. 1982), *aff'd*, 465 U.S. 513 (1984) ................................................................................................................................. 34

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) ................................................................................................................................. 29

*Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)........................................... 29

**Other Authorities**

Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L.J. 227, 227–28 (1998) ............................................................................................................. 28

H.R. Rep. No. 95-595, at 412 (1977)........................................................................................... 13

S. Rep. No. 95-989........................................................................................................................ 13

Vyera Pharmaceuticals, LLC and its affiliated debtors and debtors in possession in the above-captioned subchapter V cases (collectively, the "Debtors"), by and through their counsel, DLA Piper LLP (US), hereby file this brief (this "Confirmation Brief") in support of confirmation of the *Debtors' Second Amended Joint Subchapter V Plan of Reorganization and Liquidation* (as amended, supplemented, or otherwise modified, the "Plan"), to be filed shortly, and in response to the objection filed by the Daraprim Class Action Settlement Class [D.I. 243] (the "Objection") to confirmation of the Plan.  In support of this Confirmation Brief, the Debtors rely upon and incorporate by reference (i) the *Declaration of Thomas J. Allison in Support of Confirmation* (the "Allison Declaration"), (ii) the *Declaration of Jordan Meyers in Support of Confirmation* (the "Meyers Declaration"), and (iii) the *Declaration of Mark Belanger in Support of Confirmation* (the "Belanger Declaration"), each to be filed shortly.  The Debtors further rely upon and incorporate by reference the First Day Declaration (defined below), and respectfully state as follows:

## PRELIMINARY STATEMENT[2]

1.      The Debtors come before the Court with a Plan confirmable as a "consensual plan" under section 1191(a) of the Bankruptcy Code.  This result culminates months of tireless work from the Debtors and their professionals, and robust discussions, comments, and negotiations with, among other parties, the Office of the United States Trustee for Region 3 (the "U.S. Trustee"), the Subchapter V Trustee appointed in these subchapter V cases, Cerovene and DRL, the Ad Hoc Equity Group, the Akkadian Parties, Duane Morris, and various other parties in interest.

---

[2]      Capitalized terms used in this Preliminary Statement have the meanings set forth below or in the Plan, as applicable.

2.      Unfortunately, notwithstanding good faith efforts throughout these subchapter V cases, the Class Action Plaintiffs (and to an extent, the States) remain as the sole impediment to a fully consensual process.  Despite continued attempts by the Debtors to negotiate, on September 6, 2023, the Class Action Plaintiffs filed their Objection.  In large part, the Objection clings to the legally unsound, counterintuitive notion that their contingent claim against the Debtors is "secured", their purported lien is "perfected", and extends to the Debtors' Cash even though they are currently owed nothing.  To wit, despite entering into the Consent Order and executing the Settlement Agreement back in early 2022, the Class Action Plaintiffs and the States failed to file UCC-1 financing statements for well over a year—the Class Action Plaintiffs filed UCC-1 financing statements on February 8, 2023 and the States filed a UCC-1 financing statement on May 4, 2023, subjecting each purported lien to avoidance under section 547 of the Bankruptcy Code.

3.      Due to this infirmity in perfection of their liens, the Debtors classified the Class Action Plaintiffs' and the States' contingent claims as Class 3(b) Unsecured Claims, which nonetheless are treated as unimpaired under the Plan.  The Debtors have made crystal clear throughout these subchapter V cases that no party wishes to abridge the Class Action Plaintiffs' or the States' rights to receive a percentage of proceeds from non-ordinary course sale transactions (i.e., the Daraprim Sale and a PRV sale).  In fact, the Debtors have, to date, timely made all of the required payments under the Consent Order and Settlement Agreement.  However, apparently unsatisfied with the "unsecured" title of their Plan class, the Class Action Plaintiffs now, in their Objection, claim that they have a perfected security interest over all of the Debtors' assets, including the Debtors' Cash, even though they are currently owed nothing.

Further, the Class Action Plaintiffs argue that the Debtors have failed to obtain authority to use the Class Action Plaintiffs' alleged cash collateral.

4.      In brief, the Class Actions Plaintiffs allegations are legally unsound and without merit.  More importantly, perhaps, standing in the way of confirmation of the Debtors' Plan in which their claims will be unimpaired is squarely against their constituents' interests.

5.      This Confirmation Brief will respond to each of the Class Action Plaintiffs' objections (to the extent not mooted by changes at the behest of the U.S. Trustee) and state why the Plan is confirmable as a "consensual plan" under section 1191(a) of the Bankruptcy Code or, in the alternative, as a "nonconsensual plan" under section 1191(b) of the Bankruptcy Code.

## BACKGROUND

6.      On May 9, 2023 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and elected to proceed under subchapter V thereunder.  Contemporaneously therewith, the Debtors filed their *Joint Subchapter V Plan of Reorganization and Liquidation* [D.I. 11].  On July 11, 2023, the Debtors filed their *Amended Joint Subchapter V Plan of Reorganization and Liquidation* [D.I. 157].  Shortly after the filing hereof, the Debtors will be filing the *Second Amended Joint Subchapter V Plan of Reorganization and Liquidation* (the "Plan").  The Debtors hereby incorporate by reference the background facts set forth in Docket No. 157 and the Plan Supplement, as well as the additional background facts to be set forth in the Plan.

## ARGUMENT

**I.    The Class Action Plaintiffs' asserted liens are avoidable notwithstanding contrary language in the prepetition Settlement Agreement.**

7.      This Confirmation Brief is not an adversary complaint, nor do the Debtors wish to fully brief the matter herein.  However, the Debtors have been clear in their communications

with the Class Action Plaintiffs since the commencement of these subchapter V cases that the Class Action Plaintiffs' and the States' asserted liens are patently avoidable.

8.      On December 7, 2021, the District Court entered the Consent Order.    On February 25, 2022, the States, Phoenixus, and Vyera entered into the States Security Agreement. Over a year later, on May 4, 2023 (only five (5) days before the Petition Date), the States filed a UCC-1 financing statement.

9.      Similarly, on January 28, 2022, the Class Action Plaintiffs entered into the Settlement Agreement with Phoenixus, Vyera, Kevin Mulleady, and Martin Shkreli.  A month later, on February 28, 2022, these parties entered into the Class Security Agreement.  Almost a year later, on February 8, 2023 (90 days before the Petition Date), the Class Action Plaintiffs filed UCC-1 financing statements.

10.     Both the States' and the Class Action Plaintiffs' purported security interests are voidable as preferences, and the States and the Class Action Plaintiffs are not allowed secured creditors of the Debtors.[3]  Upon avoidance, the States and the Class Action Plaintiffs will not have valid liens against the Debtors.

11.     Moving on to the second major focus of the Objection, in its papers, the Class Action Plaintiffs have articulated for the first time that they believe their purportedly perfected security interest extends past the contours of the Settlement Agreement and the Class Security Agreement to also cover all of the assets of Vyera and Phoenixus, including specifically with respect to the Debtors' Cash.  This contention is baseless.

12.     Article 9 of the UCC and its state law equivalents dictates perfection requirements with respect to certain personal property, including cash and deposit accounts.  Article 9 is plain

---

[3]      The Debtors join in the arguments made by Cerovene and DRL in the *Response of Cerovene, Inc. and Dr. Reddy's Laboratories, Inc. to the Objection of Creditor Daraprim Class Action Settlement Class to Confirmation of the Debtors' Amended Joint Subchapter V Plan of Reorganization and Liquidation* [D.I. 263].

that perfection over cash requires possession; perfection over deposit accounts requires control. *See, e.g.*, UCC §§ 9-104, 9-304, 9-312, 9-313. The Class Action Plaintiffs have not articulated why their purported liens are not subject to the same perfection requirements to which all other secured creditors are subject. For the avoidance of doubt, the Class Action Plaintiffs do not possess, nor have they ever possessed, the Debtors' Cash, nor are they party to any depository account control agreements with the Debtors and the Debtors' banks.

13.     Next, as set forth in the Meyers Declaration, prepetition, the Debtors are in full compliance with the Consent Order and the Settlement Agreement. Thereunder, the States and Class Action Plaintiffs are entitled to 20% of Net Proceeds from the sale, license, transfer, or other monetization of a "Corporate Asset". *See* Consent Order, at 12 ¶ C; Settlement Agreement, at 12–16 ¶ 61. "Corporate Asset" expressly excludes "any inventory, goods or products that are sold or to be sold in the ordinary course of business, including, without limitation, any APIs, raw materials, or finished product." *See* Consent Order, at 4; Settlement Agreement, at 3. On the dates set forth below, the Debtors made payments totaling $12,466,234.23 to the Settlement Fund, representing the initial downstroke and payment in full of 20% of the "Net Proceeds" from sales of qualifying "Corporate Assets". Specifically, the Debtors made the following payments (which the Debtors understand is subject to a 70/30 split):

| Date | Payment | Reason |
|------|---------|--------|
| 1/13/2022 | $10,000,000 | Guaranteed payment |
| 4/29/2022 | $800,000 | 20% on $4,000,000 received from the sale of Seelos Therapeutics, Inc. ("Seelos") stock |
| 8/18/2022 | $1,227,314.23 | 20% on $8,000,000 product sales to ANI |
| 1/25/2023 | $238,920 | 20% on $1,194,600 received from the sale of Seelos stock |
| 3/2/2023 | $100,000 | 20% of $500,000 for sale of Seelos stock |
| 3/31/2023 | $100,000 | 20% of $500,000 for sale of Seelos stock |

14.     Conspicuously absent from the Objection is any mention of these prepetition payments.  The reason is apparent: the Class Action Plaintiffs have already received their portion of the 20% net proceeds from sales of "Corporate Assets" required under the Settlement Agreement and are owed nothing.

15.     In addition, as set forth in the Meyers Declaration, the Debtors' Cash today comprises (i) the Debtors' own 80% share of the Net Proceeds of Corporate Asset sales and (ii) proceeds from ordinary course of business sales of the Debtors' inventory, which, as noted above, are excluded from the definition of Corporate Assets (and thus not subject to an 80/20 split).  Accordingly, the Class Action Plaintiffs have no basis to claim an interest in the Debtors' Cash since they are not owed anything.  Even if they were, the source of the Debtors' Cash— ordinary course sales and the Debtors' 80% share of Net Proceeds—is expressly excluded from the Consent Order, the Settlement Agreement, and the corresponding security agreements.

16.     Assuming arguendo that the foregoing was not applicable to the current circumstances, the Class Action Plaintiffs have waived their rights to consent or reject the Debtors' use of cash collateral in these subchapter V cases.  Not once during the pendency of these subchapter V cases have the Class Action Plaintiffs objected to the Debtors' use of its own Cash, whether through payments authorized under first day orders or otherwise.  In two words, the Class Action Plaintiffs are too late.

17.     Lastly, briefly touching on the various arguments regarding the significant "bankruptcy protection" contained in the Settlement Agreement, it is axiomatic that prepetition agreements cannot bind a debtor in possession to waive a fundamental bankruptcy law right. *See, e.g.*, *In re Trans World Airlines, Inc.*, 261 B.R. 103, 115 (Bankr. D. Del. 2001); *In re Montgomery Ward, LLC*, 634 F.3d 732 (3d Cir. 2011) (collecting cases).  Any prepetition

agreement to "not contest" the Class Action Plaintiffs' asserted liens is not binding on the Debtors as debtors in possession in these subchapter V cases. Further, the language cited by the Class Action Plaintiffs likely violates section 365(e) of the Bankruptcy Code as well as an invalid *ipso facto* clause conditioned upon the Debtors' bankruptcy filing.

18.    In an effort to resolve the Objection (along with the objection to the Daraprim Sale), the Debtors have offered the Class Action Plaintiffs a choice: (i) agree to the current treatment under the Plan of their contingent Claims as unsecured, but unimpaired—entitling them to the full percentage of net proceeds resulting from the Daraprim Sale and a potential PRV sale mooting out any possible avoidance challenge; or (ii) the Debtors make the technical modification to the Plan to designate Class 3(b) as a "Secured Class" with the express reservation of rights for the Debtors, the Liquidating Trustee, and any other party in interest to seek to avoid the Class Action Plaintiffs' "Secured Claim" under chapter 5 of the Bankruptcy Code.

19.    The Debtors believe there is only one logical choice. However, should the Class Action Plaintiffs choose option 2, the effect of avoidance is that they would have a contingent Class 3(a) Claim, which would share *pro rata* with all other Class 3(a) Allowed Claims, including the $38 million Allowed Claim under the Cerovene Agreement.

**II.    The Plan satisfies the disclosure requirements of section 1190 of the Bankruptcy Code.**

20.    Pursuant to section 1190 of the Bankruptcy Code, a plan filed under subchapter V:

(1) shall include—

      (A)    a brief history of the business operations of the debtor;

      (B)    a liquidation analysis; and

(C)    projections with respect to the ability of the debtor to make payments under the proposed plan of reorganization;

(2) shall provide for the submission of all or such portion of the future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan ….

11 U.S.C. § 1190(1)–(2).

21.    The Plan satisfies such requirements.  Article III of the Plan contains a more-than-brief history of the Debtors' business operations and describes key events that transpired before and during these subchapter V cases.  Exhibit A to the Plan includes the Debtors' liquidation analysis.  As set forth below, the liquidation analysis, coupled with the Meyers Declaration, satisfies the best interests of creditors test.  The Plan also includes projections as to the costs of the ORL Business on a discounted year-over-year basis and provides for both the initial distribution of $4 million dollars in the GUC Reserve within 90-days of the Effective Date and the provision of Liquidating Trust Certifications to Holders of Allowed Claims with respect to any distributions stemming from the monetization of a PRV from the FDA for ORL-101.  As such, the Plan satisfies section 1190 of the Bankruptcy Code and, in fact, provides significantly more information than is required.

## III.    The Plan satisfies the requirements of section 1191(a) of the Bankruptcy Code and can be confirmed as a "consensual plan".

22.    The Plan may be confirmed as a "consensual plan" under section 1191(a) of the Bankruptcy Code because it satisfies the requirements of section 1129(a) of the Bankruptcy Code (other than section 1129(a)(15)).  The Plan provides for an initial distribution of Cash from the GUC Reserve to Holders of Allowed Claims and then contemplates the ***payment in full in Cash*** of all Allowed Claims and Equity Interests upon the successful monetization of a PRV from the FDA for ORL-101.  In addition, as a result of several settlements achieved in

connection with preparing the Plan, the Debtors enjoy overwhelming support for the Plan—i.e., more than 98% in amount and 85% in number voted in favor of the Plan.  The voting deadline, as well as the Plan objection deadline, was September 6, 2023 at 4:00 p.m. (ET).  Only the Daraprim Class Action Settlement Class has filed a substantive objection to the Plan.[4]

23.     Here, the Debtors can demonstrate, by a preponderance of the evidence, that each requirement of section 1129(a) (other than 1129(a)(15)) is met or is otherwise inapplicable.  *See, e.g.*, *In re W.R. Grace & Co.*, 475 B.R. 34, 114 (applying the preponderance of the evidence standard to certain elements of section 1129(a) of the Bankruptcy Code).

**A.  The Plan complies with section 1129(a)(1) of the Bankruptcy Code.**

24.     Section 1129(a)(1) of the Bankruptcy Code provides that a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code].  According to the legislative history underpinning section 1129(a)(1) of the Bankruptcy Code, this provision relates directly to the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern classification of claims and the contents of a plan, respectively.  *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see also In re Johns-Mansville Corp.*, 843 F.2d 636 (2d Cir. 1988).

**B.  The Plan complies with section 1122 of the Bankruptcy Code.**

25.     Section 1122 of the Bankruptcy Code allows for a plan to "place a claim or interest in a particular class only if such claim or interest is substantially similar to other claims or interests of such class."  Courts have significantly broad discretion as to determinations of the propriety of classification schedules and will "uphold a plan's classification scheme so long as it

---

[4]      On September 11, 2023, the Ad Hoc Equity Group filed the *Ad Hoc Equity Group's Objection and Reservation of Rights to Confirmation of Debtors' Amended Joint Subchapter V Plan of Reorganization and Liquidation* [D.I. 259], which, in short, objects to confirmation of the Plan in the event the parties cannot resolve ongoing negotiations regarding certain modifications to the Plan and the form of liquidating trust agreement.  The Debtors fully expect to resolve these issues consensually.

is 'reasonable' and does not arbitrarily designate classes". *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (internal quotations omitted).

26.     Here, the Plan contemplates five (5) Classes of Claims and Equity Interests, with Class 3 comprising both Class 3(a) and Class 3(b) Claims as general unsecured classes of Claims.   Class 3(a) includes various trade creditors, litigation creditors, and other similarly situated parties.   By contrast, Class 3(b) was originally termed "FTC Claims" to cover claims stemming from the Consent Order and the Settlement Agreement with the States and the Class Action Plaintiffs, respectively.   Both through an exhibit to the Plan Supplement and through a robust discussion in the updated Plan, the Debtors have made clear which parties make up Class 3(b).   Class 3(b) is bifurcated from Class 3(a) because claims arising under the Consent Order and the Settlement Agreement are contingent upon the Debtors' receipt of sale proceeds from certain Debtor assets.   Further, entitlement to such sale proceeds is subject to certain caps and additional conditions.   Accordingly, the Debtors appropriately separated the Holders of Class 3(b) Claims from the Holders of Class 3(a) Claims.

27.     In their Objection, the Class Action Plaintiffs argue that the Debtors have impermissibly classified their contingent claim in Class 3(b) as unimpaired and unsecured.   For the avoidance of doubt, this treatment, in practice, effectively immunizes the Class Action Plaintiffs from a challenge based upon the infirmity of their perfection of asserted liens. Notwithstanding, the Class Action Plaintiffs argue that the "Plan fails to designate a secured class for the Class Action Plaintiffs' secured claim and fails to provide for its treatment under the Plan." Objection at ¶ 30.

28.     As set forth above, the Debtors appropriately classified the Class Action Plaintiffs' contingent claim as a Class 3(b) Claim due to their clearly avoidable UCC-1 financing

statements. Therefore, the Plan satisfies the requirements of section 1122 of the Bankruptcy Code.

### C. The Plan satisfies the requirements of section 1123(a)(1)–(8) of the Bankruptcy Code.

29. Section 1123(a)(1) of the Bankruptcy Code is satisfied because the Plan designates all Classes of Claims and Equity Interests other than those specified in sections 507(a)(2), 507(a)(3), and 507(a)(8). Unclassified Claims are set forth in Article IV of the Plan.

30. Section 1123(a)(2) of the Bankruptcy Code is satisfied because Article V of the Plan sets forth that Classes 1, 2, 3(b) and 4 are Unimpaired under the Plan; Class 5 (Intercompany Claims) is impaired but deemed to accept given the Plan's proposed deemed substantive consolidation for Plan purposes. With respect to Class 3(b), both the States and the Class Action Plaintiffs necessarily will be paid in full through a combination of, the Daraprim Sale, or other post-Effective Date sale of Corporate Assets or the monetization of the PRV.

31. Section 1123(a)(3) of the Bankruptcy Code is satisfied because Article V of the Plan sets forth that Class 3(a) is impaired and was entitled to vote on the Plan—and has voted overwhelmingly to accept the Plan. Specifically, Holders of Allowed Class 3(a) Claims will initially receive distributions from the $4 million GUC Reserve and then potentially be paid the remainder of their respective claims depending on the successful monetization of a PRV through the ORL Business.

32. Section 1123(a)(4) of the Bankruptcy Code is satisfied because Holders of Claims or Equity Interests, as applicable, in each Class will receive the same treatment as other Holders in the same Class on account of their Allowed Claims or Equity Interests. The Class Action Plaintiffs are classified in Class 3(b) and will receive the requisite treatment thereunder (which may ultimately vary depending on the choice laid out above). While the Debtors' initial Plan

iteration may have not articulated the composition of "FTC Claims" comprehensively enough, the clarification set forth in the Plan Supplement and the discussions of the Class Action Plaintiffs and the States' contingent Claims in the current Plan are certainly sufficient.[5]

33.    Section 1123(a)(5) of the Bankruptcy Code is satisfied because the Plan sets forth adequate means for the Plan's implementation.  Specifically, the Plan provides for the establishment of, and transfer of property to, a Liquidating Trust to be administered by a Liquidating Trustee.  The Liquidating Trustee will, among other things, direct the operations of the ORL Reorganized Debtor of the ORL Business, pursue Causes of Action on behalf of the Liquidating Debtors and the Reorganized Debtors (including with respect to the contemplated Cause of Action against RL Fine), and liquidate the remaining Liquidating Trust Assets.  The Debtors' treatment of the Class Action Plaintiffs as Holders of Class 3(b) Claims does not violate section 1123(a)(5) of the Bankruptcy Code.

34.    Section 1123(a)(6) is inapplicable to the Plan as the Plan does not provide for the issuance of non-voting equity securities.  Notwithstanding, as set forth in the Plan, the Liquidating Trustee may, in his discretion and in concert with the PAG Reorganized Debtor, seek to commence an Equity Raise to help fund the continued development of ORL-101.

35.    Section 1123(a)(7) of the Bankruptcy Code is satisfied because the Plan contemplates that, upon the Effective Date, the equity interest owners of the PAG Reorganized Debtor will have elected to the Board of Directors several new directors slated for election at the EGM scheduled for September 19, 2023.  Additionally, as set forth in the Liquidating Trust

---

[5]     For the avoidance of doubt, the Debtors sent the clarification to be included in the Plan Supplement to the Class Action Plaintiffs' counsel roughly two-weeks before filing the Plan Supplement.  After a week of no response, counsel to the Class Action Plaintiffs responded, "Your proposed plan supplement and sale order language do not resolve the issues we've discussed on our calls. We plan to move forward with our objections."  While the Debtors would have preferred a more constructive conversation and input as to the proposed clarification, the Debtors nevertheless decided to file the Plan Supplement to provide more transparency to the Court and parties in interest.

Agreement, the Liquidating Trustee will be appointed as the sole director of the ORL Reorganized Debtor.  The Debtors submit that these appointments would be in the best interests of the Debtors' creditors and equity interest owners and is consistent with public policy.

36.     Section 1123(a)(8) of the Bankruptcy Code is inapplicable to these subchapter V cases as none of the Debtors are individuals.

### D.  The Plan complies with section 1129(a)(2) of the Bankruptcy Code.

37.     Section 1129(a)(2) of the Bankruptcy Code provides that the proponent of a plan must comply with the applicable provisions of the Bankruptcy Code.  Courts have interpreted this provision generally as relating to the Bankruptcy Code's requirements for solicitation of votes in support of a plan.  *See, e.g.*, *In re Texaco Inc.*, 84 B.R. 893, 906–07 (Bankr. S.D.N.Y. 1988).  As set forth above, the Debtors have only solicited Holders of Class 3(a) Claims.  In response to the Class Action Plaintiffs' statement that the Debtors' "failed to schedule the Class Action Plaintiff's debt," Objection at ¶ 35, the Debtors originally scheduled a claim in the amount of $0.00 for the "Federal Trade Commission and Various State AG's", listing the basis for claim as "Settlement Agreement".  *See* D.I. 67.

38.     As information became clear that the States and the Class Action Plaintiffs shared in the funds paid into the Settlement Fund, the Debtors asked the Class Action Plaintiffs to file proofs of claim as they deemed appropriate, so as to both save in the administrative burden and costs of filing amended schedules and to have a clear understanding from the Class Action Plaintiffs as to their alleged contingent Claims.  Accordingly, the Plan satisfies section 1129(a) of the Bankruptcy Code.

39.     The Debtors served ballots, a form of which is attached to the *Declaration of Stephenie Kjontvedt of Epiq Corporate Restructuring, LLC Regarding the Solicitation and*

*Tabulation of Ballots Cast on the Debtors' Amended Joint Subchapter V Plan of Reorganization and Liquidation* [D.I. 267] (collectively, the "Ballots"), on eligible voters in Class 3(a). The form of Ballots is appropriate because it contains requisite instructions for voting to accept or reject the Plan and contain sufficient information to make a knowing and voluntary election with regard to the third-party releases contained in Article XI of the Plan, including procedures for any voting party to elect to "opt-in" to such third-party releases. Accordingly, the Debtors satisfy section 1129(a) of the Bankruptcy Code.[6]

### E. The Plan complies with section 1129(a)(3) of the Bankruptcy Code.

40.     Section 1129(a)(3) of the Bankruptcy Code provides that a plan must be "proposed in good faith and not by any means forbidden by law." Under Bankruptcy Rule 3020(b)(2), "If no objection [to a plan] is timely filed, the court may determine that the plan has been proposed in good faith and not by any means forbidden by law without receiving evidence on such issues."

41.     The Debtors have proposed the Plan in good faith. Courts have recognized "good faith" upon (i) a showing the plan was proposed with honesty and good intentions and (ii) the existence of a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code. *See, e.g.*, *In re Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988); *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985) ("Where the plan is proposed with the legitimate and honest purpose to recognize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied.").

42.     Here, the Debtors have endeavored since the inception of these subchapter V cases to come to this Court with a fully consensual Plan capable of confirmation under section

---

[6]     The prior iteration of the Plan contained third-party release language that contemplated an "opt-out" procedure. However, through discussion with the U.S. Trustee, the Debtors have modified such language to operate as an "opt-in" third-party release, consistent with the mechanism set forth in the Ballots.

1191(a) of the Bankruptcy Code.  To that end, as set forth above and in greater detail in Article III of the Plan, the Debtors have worked diligently to (i) negotiate resolutions with their significant stakeholders, including, without limitation, Cerovene and DRL, Duane Morris, the Ad Hoc Equity Group, and the Akkadian Parties, (ii) monetize certain of the Debtors' assets through the sale transaction to Tilde Sciences Inc., (iii) take steps toward investigating potential Causes of Action, which may lead toward substantial recoveries for the Debtors' Estates, and (iv) otherwise maximize the value of their Estates to help deliver the best available recoveries to stakeholders.

43.     Through hard work and determination, the Debtors have proposed a consensual plan that maximizes value for the benefit of all stakeholders.  Indeed, through the Plan, not only can Holders of Allowed Claims be *paid in full in Cash* depending on the success of the ORL Business, but Holders of Allowed Equity Interests may receive a substantial recovery as well. The Plan enjoys overwhelming support from each of its major credit constituencies but one—the Class Action Plaintiffs.  As discussed elsewhere in this Confirmation Brief, however, the Class Action Plaintiffs' contentions either are legally unsound, inappropriate, misrepresentative of the facts and circumstances of these subchapter V cases, or are practically moot.

44.     It necessarily follows that there is substantial support for a finding that the Plan has been proposed in good faith and not by any means forbidden by law.  Accordingly, section 1129(a)(3) of the Bankruptcy Code is satisfied.

**F.  The Plan complies with section 1129(a)(4) of the Bankruptcy Code.**

45.     Section 1129(a)(4) of the Bankruptcy Code provides that any payments made by the debtor "for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the

approval of, the court as reasonable." Article XII of the Plan provides that the Court will retain jurisdiction over these subchapter V cases, including, without limitation, the determination of (i) all controversies relating to or concerning the allowance of Administrative Claims and (ii) requests for payment of Administrative Claims, including any and all Professional Fee Claims.

46.    Except as otherwise ordered by the Court, estate professionals must file and serve a properly noticed final fee application, over which the Court has jurisdiction to rule on and allow, as applicable. Only Professional Fee Claims allowed by the Court will be paid by the Reorganized Debtors. Accordingly, section 1129(a)(4) of the Bankruptcy Code is satisfied.

### G. The Plan complies with section 1129(a)(5) of the Bankruptcy Code.

47.    Section 1129(a)(5) of the Bankruptcy Code requires that (i) the plan proponent disclose the identity of any individual that will serve as a director, officer, or voting trustee of the debtor after confirmation of the plan, and (ii) the plan proponent disclose the identity of any insider that will be employed by a reorganized debtor and the nature of such insider's compensation.

48.    Upon the Effective Date, the Liquidating Trustee will be appointed as the sole director of the ORL Reorganized Debtor, depending on the results of the election of a new slate of directors to the Board of Directors of the PAG Reorganized Debtor at the EGM, Guy-Charles Fanneau De La Horie, Ross Maclean, Mathieu Bigois, and Jean-Luic Elhoueiss may comprise the Board of Directors. To the extent appointed, these individuals may be compensated in accordance with the PAG Reorganized Debtors' articles of incorporation and/or bylaws. The Debtors submit that the appointment of the Liquidating Trustee and these individuals, to the extent duly elected by the equity interest owners of Phoenixus, are in the best interests of the

Debtors' creditors and equity interest owners and is consistent with public policy. Accordingly, the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

**H.  Section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Plan.**

49.    Section 1129(a)(6) of the Bankruptcy Code provides that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate changes provided for in the plan …."  Such provision is not applicable to the Debtors' business or the Plan.

**I.    The Plan complies with section 1129(a)(7) of the Bankruptcy Code.**

50.    Section 1129(a)(7) of the Bankruptcy Code provides:

With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

  (i)  has accepted the plan; or

  (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date ….

51.    Courts have often referred to this provision as the "best interests test" with respect to a plan, under which the court must find that each non-accepting creditor will receive property of value "that is not less than the amount such holder would receive … if the debtor were liquidated under chapter 7." *Bank of Am. Nat. Tr. & Sav. As'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 (1999).

52.    Here, as set forth in the Article III.H. of the Plan and in the Liquidation Analysis set forth in Exhibit A to the Plan, liquidation under chapter 7 would result in significantly smaller distributions, if any, being made to non-accepting creditors than those provided for in the Plan.  At base, liquidation under chapter 7 would result in significantly smaller distributions, if

any, being made to creditors than those provided for under the Plan because (a) a chapter 7 trustee would likely be unable to monetize the ORL Business, (b) there is not a likelihood that a chapter 7 trustee could sell or otherwise dispose of the Debtors' assets in an orderly fashion over a short period of time, (c) there would be significant, additional administrative expenses involved in the appointment of a chapter 7 trustee, and (d) additional expenses and Claims, some of which would be entitled to priority, would be generated during the liquidation, including Claims resulting from the rejection of all of the Debtors' executory contracts and unexpired leases, including those sought to be assumed through the Plan, in connection with the cessation of all operations.

53.    As set forth in the Plan's brief sensitivity analysis regarding the value of a PRV issued by the FDA in respect of ORL-101, which comprises a limited DCF analysis and comparable transaction analysis, the discounted value of the PRV is as follows: assuming $105 million in proceeds from a PRV sale, discounted through a probability range of 5% to 20%, and adjusted for probability assumed costs of $3.3 million, the ORL Business generates a net present value ranging from $800,000 to $12.7 million.    The Debtors submit that this analysis is significantly conservative to provide parties in interest with the clearest possible picture of the probability of success for the ORL Business and has provided parties entitled to vote on the Plan with sufficient information to vote on whether to accept or reject the Plan.    And as evident from the overwhelming support enjoyed by the Plan, parties entitled to vote on the Plan believe in the process proposed.

**J.    The Plan complies with section 1129(a)(8) of the Bankruptcy Code.**

54.    Section 1129(a)(8) of the Bankruptcy Code provides that each class of claims and interests under a plan either accept the plan or not be impaired under the plan.    A class of claims

is deemed to "accept" a plan if holders of at least two-thirds in dollar amount and more than half of the number of claims in that class votes to accept the plan. *See* 11 U.S.C. § 1126(c)–(d).

55.    The Plan provides that each Class of Claims and Equity Interests is either unimpaired or, as is the case with Class 3(a), is impaired and entitled to vote on the Plan. Accordingly, the Debtors solicited votes from Holders of Class 3(a) Claims.  As set forth in the Voting Declaration, 99.31% in dollar amount and 85.71% in number of claims voted to accept the Plan.   Accordingly, the Debtors submit that the Plan satisfies section 1129(a)(8) of the Bankruptcy Code.

56.    The Class Action Plaintiffs' arguments as to 1129(a)(8) suffer from the same infirmities as the rest of their contentions.  The Debtors dispute the validity of the Class Action Plaintiffs' security interest.  Notwithstanding, the Debtors' Plan treats the Class Action Plaintiffs as unimpaired and fully entitled to their share of sale proceeds within the contours of the Settlement Agreement.  To invent impairment, the Class Action Plaintiffs point to a number of provisions from the Plan, including, without limitation, the transfer of assets to the Liquidating Trust, "diversion of $4 million of the Class Action Plaintiffs' cash collateral …", and the Plan's contemplation of an equity raise in the event funds are insufficient post-Effective Date to continue to develop ORL-101.

57.    Again, the Class Action Plaintiffs are deemed unimpaired under the Plan, will receive the full amount of their entitlement to net proceeds from the Daraprim Sale, and will receive an unimpaired cut of the net proceeds from a PRV sale.  Even assuming arguendo that the assortment of Plan provisions cited to by the Class Action Plaintiffs constitutes impairment, (i) the Debtors would estimate the Class Action Plaintiffs' Claim at $1.00 for voting purposes since their Claim is entirely contingent upon the occurrence of certain events, and (ii) the

Debtors would cram down the Class Action Plaintiffs because Class 3(a) is impaired and has voted overwhelmingly in favor of the Plan.

### K.  The Plan complies with section 1129(a)(9) of the Bankruptcy Code.

58.    Section 1129(a)(9) of the Bankruptcy Code provides:

Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim:

(A) the holder of a claim entitled to priority under section 507(a)(2) or (3) must receive cash equal to the allowed amount of its claim on the effective date of the plan;

(B) the holder of a claim entitled to priority under section 507(a)(1), (4), (5), (6), or (7) must receive either cash in the allowed amount of such claim on the effective date of the plan or deferred cash payments of a value, as of the effective date, equal to the allowed amounts of such claim; and

(C) the holder of a tax claim entitled to priority under section 507(a)(8) must receive on account of such claim deferred cash payments, over a period not exceed six years after the date of assessment of such claim, of a value, as of the effective date of a plan, equal to the allowed amount of such claim.

59.    The Plan provides for the payment in full of, or otherwise reservation for, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Professional fee Claims, and the costs and expenses of the Liquidating Trustee, as well as the payment in full on the Effective Date, to the extent not already paid pursuant to a Court order, of Class 1 Priority Claims.  Accordingly, the Plan satisfies section 1129(a)(9) of the Bankruptcy Code.

### L.  The Plan complies with section 1129(a)(10) of the Bankruptcy Code.

60.    Section 1129(a)(10) of the Bankruptcy Code provides, "If a class of claims is impaired under the Plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."  As set forth above, each Class of Claims or Equity Interests is either unimpaired or, as is the case with Class

3(a), impaired but has voted overwhelmingly to accept the Plan.  Accordingly, the Debtors submit that the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

### M. The Plan complies with section 1129(a)(11) of the Bankruptcy Code.

61.     Section 1129(a)(11) of the Bankruptcy Code provides that a plan must represent that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan …." Courts have interpreted this provision to require that a plan present only a "reasonable probability of success."  *See, e.g.*, *In re American Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (explaining that while a plan's success need not be guaranteed, it must propose "a realistic and workable framework").

62.     Consummation of the Plan is feasible because, among other things, (i) the Debtors will transfer sufficient Cash and other assets to the Liquidating Trust on the Effective Date to fund the initial development need for ORL-101, with the possibility of the Liquidating Trustee directing, in concert with the PAG Reorganized Debtor, an Equity Raise to bring in additional funds for continued development.  In addition, the Debtors have identified certain Causes of Action, including a potential avoidance claim totaling over $9.5 million against RL Fine, that may further augment the Liquidating Trust's cash resources to fund ORL-101.  Additionally, the Plan contemplates an Oversight Committee comprising six (6) members representative of diverse interests in these subchapter V cases.  Specifically, the Oversight Committee will comprise creditors—Cerovene, DRL, Duane Morris, and the Class Action Plaintiffs—as well as equity holders—the Ad Hoc Equity Group and the Akkadian Parties and/or the Receiver (depending on the closing of the proposed sale of Martin Shkreli's shares in Phoenixus by the Receiver to the Akkadian Parties).

63.    As set forth in the Meyers Declaration, while the Debtors initially intended to fully fund the ORL Business on the Effective Date, the Debtors negotiated a compromise with its key stakeholders to fully fund the critical first year of development while relying on an equity rights offering and litigation recoveries to fund later years.  This compromise enabled the Debtors to distribute $4 million to the GUC Reserve on emergence and cover additional administrative and operational costs.

64.    Notwithstanding, as set forth in the Plan, the Oversight Committee will, subject to certain moratoriums and other conditions, be empowered to vote to abandon the ORL Business if warranted and distribute remaining cash to stakeholders.

65.    Accordingly, the Debtors submit that the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code notwithstanding the Class Action Plaintiffs' bald assertions to the contrary.

**N.  Section 1129(a)(12) of the Bankruptcy Code is inapplicable to the Plan.**

66.    Section 1129(a)(12) of the Bankruptcy Code relates to the payment of fees under 28 U.S.C. § 1930.  However, cases arising under subchapter V of the Bankruptcy Code are excepted from such fee requirements.  Accordingly, section 1129(a)(12) is not applicable to the Plan or these subchapter V cases.

**O.  Section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan.**

67.    Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue to be paid post-confirmation of the plan at the level established by section 1114 of the Bankruptcy Code.  The Debtors do not offer any retiree benefits and, thus, section 1129(a)(13) of the Bankruptcy Code is inapplicable here.

**P.  Section 1129(a)(14) of the Bankruptcy Code is inapplicable to the Plan.**

68.     Section 1129(a)(14) of the Bankruptcy Code is not applicable to the Plan as it relates to the payment of domestic support obligations.

**Q.  Section 1129(a)(15) of the Bankruptcy Code is inapplicable to the Plan.**

69.     As set forth in section 1191(a) of the Bankruptcy Code, section 1129(a)(15) of the Bankruptcy Code is not applicable to the consideration of a subchapter V plan.

**R.  Section 1129(a)(16) of the Bankruptcy Code is inapplicable to the Plan.**

70.     Section 1129(a)(16) of the Bankruptcy Code provides that all transfers of property under a plan "shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.  Such provision is not applicable to the Debtors' business or the Plan.

**IV.    In the alternative, the Plan satisfies the confirmation requirements under section 1191(b) of the Bankruptcy Code and may be confirmed as a "non-consensual plan".**

71.     Notwithstanding the Debtors' contention that the Plan may be confirmed under section 1191(a) of the Bankruptcy Code as a "consensual plan", the Plan nevertheless satisfies the confirmation requirements under section 1191(b) of the Bankruptcy Code.  First, as discussed above, the Plan satisfies sections 1129(a)(1)–(16) of the Bankruptcy Code (excluding subsection (15) as non-applicable to subchapter V cases), and therefore necessarily satisfies the first prong of section 1191(b) of the Bankruptcy Code.

72.     Courts interpreting the term "discriminate unfairly" have held that it is a "horizontal comparative assessment applied to similarly situated creditors (here unsecured creditors) where a subject of those creditors is classified separately, does not accept the plan, and claims inequitable treatment under it."  *In re Tribune Co.*, 972 F.3d 228, 232 (3d Cir. 2020)

(citing Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L.J. 227, 227–28 (1998).   By contrast, "fair and equitable" has been interpreted "vertically" as it "regulates priority among classes of creditors having higher and lower priorities.   For example, secured creditors are a higher priority for payment than unsecured creditors.   For the sake of completeness, 'impaired' means a creditor whose rights under a plan are altered (obviously adversely)."  *Id.* at 232 (internal citations omitted).

73.    As discussed above, the Plan does not unfairly discriminate between unsecured creditors classified under separate classes.   The Class Action Plaintiffs' contingent Claims are necessarily in a separate Class because they are treated as unimpaired under the Plan and entitled to the full amount of net proceeds within the contours of the Settlement Agreement.   Again, notwithstanding the infirmities of such claim, the Debtors are amenable to modifying the Plan technically to re-classify Class 3(b) as a "Secured Claim", subject to the reservation of rights of all parties in interest to seek to avoid the Class Action Plaintiffs' and/or the States' asserted liens.

74.    Subchapter V plans enjoy certain benefits that traditional chapter 11 plans do not. For example, subchapter V plan do not technically have to comply with the absolute priority rule, which is how the Debtors are able to provide unimpaired value to the Class Action Plaintiffs while also deeming them to be general unsecured creditors in Class 3(b).   The Plan does not unfairly discriminate against the Class Action Plaintiffs; to the contrary, the Plan fully preserves the Class Action Plaintiffs' and States' rights to 20% of Net Sales of Corporate Assets ahead of Class 3(a) Claims.

75.    As set forth above, even if the Court were to deem the Class Action Plaintiffs impaired under the Plan, the Debtors would estimate their contingent claim at $1.00 for voting purposes an then cram them down under section 1129(a)(8) of the Bankruptcy Code.

76.    Accordingly, the Plan does not unfairly discriminate against any Holder of a Claim or Equity Interest and is fair and equitable under the circumstances.

## V.    The Court should approve the settlements set forth in the Plan under Bankruptcy Rule 9019.

77.    Bankruptcy Rule 9019(a) provides, in relevant part, that [o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Compromises and settlements are "a normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).  Approval of a proposed settlement is appropriate where the compromise is fair, reasonable, and in the interests of a debtor's estate.  *See In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) ("The court does not have to be convinced that the settlement is the best possible compromise.  Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities.") (internal citations omitted).

78.    Article III of the Plan sets forth certain settlement agreements entered into by the Debtors during the pendency of these subchapter V cases.    As set forth in the Allison Declaration, the Debtors entered into each of these settlement agreements in good faith and through arms'-length negotiations by and through the Debtors' professionals and are in the best interests of the Debtors, their Estates, and all parties in interest.

## VI.    The Plan's release, exculpation, and injunction provisions are appropriate and comply with the Bankruptcy Code.

79.    Article XI of the Plan includes certain exculpation provisions, debtor releases, third-party releases, and confirmation injunctions.  Section 1123(b) of the Bankruptcy Code permits the inclusion of these types of discretionary provisions.

## A.  The Debtor Release is appropriate and complies with the Bankruptcy Code.

80.    Article XI.A. of the Plan provides, in summary, on the Effective Date, each Released Party is deemed to conclusively, absolutely, irrevocably, and forever released by each of the Debtors and their Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever.  There is no release of (a) any obligations of any party under the Plan Documents, (b) any obligations under definitive documentation with respect to a Sale Transaction, (c) the rights of any Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment arrangement with any current or former employee, (d) the rights of any Holders of Allowed Claims or Equity Interests to receive Distributions under the Plan, or (e) any Retained Causes of Action.  Further excepted from the Debtor Releases are any releases for claims alleging gross negligence, intentional misconduct, or fraud.

81.    Article I.A of the Plan defines "Released Parties" as:

> [C]ollectively, and in each case in their capacities as such during the Subchapter V Cases, the Debtors, the Reorganized Debtors, and each of the following Persons: (i) each of the Professionals; (ii) each current member of Board of Directors; and (iii) each current employee of the Debtors, including, without limitation, each current officer of the Debtors.  For the avoidance doubt, and notwithstanding anything herein to the contrary, the following Persons shall not constitute "Released Parties" hereunder: (i) Martin Shkreli; and (ii) Kevin Mulleady.

82.    Section 1123(b)(3)(A) of the Bankruptcy Code provides that a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  It follows that the Debtors may release estate causes of action as consideration in connection with agreements, concessions, or contributions from the Debtors' various stakeholders under the Plan.  *See, e.g.*, *In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010).  Courts generally consider whether releases are appropriate based on whether the release

is (a) "fair and equitable" and (b) "in the best interests of the estate."  *See In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006).

83.     Here, as set forth in the Allison Declaration, the Debtor Releases under Article XI.A. of the Plan are fair and equitable, are in the best interests of the Debtors' estates, and are being given as consideration for substantial contributions made by each of the parties receiving such release and should be released for their significant efforts leading up to and during these subchapter V cases.

**B.  The Third-Party Releases are appropriate and comply with the Bankruptcy Code.**

84.     Article XI.B. of the Plan provides for consensual third-party releases from the Releasing Parties of the Released Parties.  This District, along with districts around the country, permits third-party releases, to the extent such third-party releases are "consensual", under Bankruptcy Rule 9019 and section 105(a) of the Bankruptcy Code.

85.     As noted above, pursuant to discussions with the U.S. Trustee with respect to the propriety of the proposed third-party releases initially proposed in the prior iterations of the Plan juxtaposed with the "opt-in" mechanism set forth in the Ballots, the Debtors have modified the Third-Party Releases in the Plan to now be entirely consensual.

86.     Specifically, Article I.A. of the Plan defines "Releasing Parties" as:

[C]ollectively, and in each case solely in its capacity as such: (a) the Released Parties; and (b) if the Debtors are required to solicit votes to accept or reject the Plan, (i) all Holders of Claims that vote to accept the Plan and opt-in to the Releases in the Plan, and (ii) all Holders of Claims that vote to reject the Plan and who do not opt in to the Releases in the Plan by checking the box on the applicable form indicating that they opt to grant the Releases provided in the Plan; and (c) with regard to each such party set forth in the foregoing subparts (a) through (b), its respective current and former agents.

87.     Article XI.B. of the Plan is highlighted in bold and is conspicuous amongst the other provisions of the Plan.  Further, with respect to the solicitation of votes to accept the Plan through the service of the Ballots on Class 3(a), the Ballots likewise highlight conspicuously the various releases, including the Third-Party Releases, contemplated by the Plan and provide specific instructions as to how to "opt-in" to the Third-Party Releases.

88.     Accordingly, this Court should approve the consensual Third-Party Releases under Bankruptcy Rule 9019 and section 105(a) of the Bankruptcy Code.

**C.  The Exculpation provision is appropriate and complies with the Bankruptcy Code.**

89.     Article XI.C. of the Plan provides for the exculpation of the Exculpated Parties, as defined in Article II.A. of the Plan (which definition is similar to that of "Released Parties" quoted above, except that it only applies to Estate fiduciaries and their agents.  Unlike the consensual Third-Party Releases, the Exculpation provided under the Plan does not affect the liability of third parties generally, but rather establishes a standard of care of actual fraud, willful misconduct, gross negligence, or criminal acts in hypothetical future litigation against any Exculpated Party for acts arising out of, or in connection with, the Debtors' subchapter V cases, the formulation, preparation, dissemination, solicitation, implementation, confirmation, or consummation of the Plan and the Plan Documents.

90.     The Exculpation under the Plan represents an integral piece of the Plan and Exculpated Parties should have a measure of protection for acts and omission taken in furtherance of these subchapter V cases and the Plan.  The Exculpation is narrowly tailored and appropriate under the circumstances and should be approved.

**D. The Plan Injunctions are appropriate and comply with the Bankruptcy Code.**

91.     Article XI.D. of the Plan provides for certain "Plan Injunctions".  Specifically, and as common in joint plans of reorganization and liquidation, subject to certain exceptions and conditions as set forth therein, such injunctions subject all Persons to permanent enjoinment from taking any of the following actions against the Reorganized Debtors or their assets: (i) commencing or continuing any manner, directly or indirectly, any action or other proceeding of any kind (including in a judicial, arbitral, administrative, or other forum); (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Liens or encumbrances; (iv) asserting any right of setoff, directly or indirectly, except as allowed by Article VIII.I of the Plan; (v) asserting any right of subrogation; and (vi) prosecuting or otherwise asserting any right, claim, or Cause of Action, released pursuant to the Plan, including, without limitation, any right, claim, or Cause of Action against an Exculpated Party that has been exculpated pursuant to Article XI.C of the Plan.  Notwithstanding, and as made clear now in the Plan after conversations with the U.S. Trustee, the Plan Injunctions do not enjoin non-discharged Claims or Equity Interests.

92.     The Plan Injunctions are a key component of the Plan because they enforce the discharge, release, and exculpation provisions that are centrally important thereto.  The absence of these key provisions would frustrate the entire purpose of pursuing a joint plan of reorganization and liquidation.

VII.    **The proposed assumption of executory contracts and unexpired leases under the Plan is proper.**

93.    Article VII.A. of the Plan provides that on the Effective Date, all Executory Contracts and Unexpired Leases shall be deemed rejected by the Debtors, unless assumed previously pursuant to an order of the Bankruptcy Court approving such assumption. Accordingly, entry of the Confirmation Order would constitute the rejection of any and all remaining Executory Contracts and Unexpired Leases under sections 365 and 1123 of the Bankruptcy Code.

94.    Section 365 of the Bankruptcy Code provides, in relevant part:

(a) [T]he trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

(b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

   (A) cures, or provides adequate assurance that the trustee will promptly cure, such default ….

95.    Courts apply the "business judgment test" in evaluating a debtor's decision to assume or reject an executory contract or unexpired lease. *See, e.g.*, *NLRB v. Bildisco & Bildisco* (*In re Bildisco*), 682 F.2d 72, 279 (3d Cir. 1982), *aff'd*, 465 U.S. 513 (1984).  Under the business judgment test, courts will uphold a debtor's decision regarding the use of property of the estate, including the decision to assume an executory contract, unless that decision is the product of bad faith, whim, or caprice.  *See, e.g.*, *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 162 (D. Del. 2006) ("Under section 365 of the Bankruptcy Code, a debtor may assume an executory contract or unexpired lease if (i) outstanding defaults under the contract or lease have been cured under section 365(b)(1) of the Bankruptcy Code, and (ii) the debtor's decision to assume such executory contract or unexpired lease is supported by valid business justifications.").

34

96.     Attached as Exhibit A to the Plan Supplement is the Debtors' Assumed Contracts Schedule are certain Executory Contracts, which, as set forth in the Meyers Declaration, the Debtors have deemed necessary to (i) the continued operation of the ORL Business by the ORL Reorganized Debtor, at the direction of the Liquidating Trustee, (ii) the reorganization of the PAG Reorganized Debtor, and (iii) such other Executory Contract as deemed necessary to assume in the business judgment of the Debtors.  Listed with each Executory Contract to be assumed is a corresponding cure amount based on the Debtors' books and records.  As set forth in the Allison Declaration, the Debtors submit that the Executory Contracts listed for assumption on the Debtors' Assumed Contracts Schedule is in the best interests of the Debtors' Estates and will help facilitate the successful development of ORL-101 for the benefit of all stakeholders.

97.     Additionally, attached as Exhibit B to the Plan Supplement is that certain *Assumption and Assignment Agreement*, dated as of September 1, 2023 (the "Eton Agreement"), by and between Oakrum Pharma, LLC and Eton Pharmaceuticals, Inc. ("Eton").  Under the Eton Agreement, the Debtors have agreed to assume and assign to Eton certain executory contracts to which Oakrum is a party in exchange for a purchase price of $150,000 and Eton's payment of cure costs in the amount of $500,000 to the applicable contract counterparties.

98.     As set forth in the Belanger Declaration, the Debtors negotiated the terms of the Eton Agreement in good faith and at arms'-length by and through the Debtors' professionals. Further, the Eton Agreement will provide additional proceeds for the Estates and avoid the incurrence of significant rejections damages claims further diluting the general unsecured claims pool.  Accordingly, the assumption and assumption and assignment of Executory Contracts contemplated by the Plan constitutes a sound exercise of the Debtors' business judgment and is in the best interest of the Debtors' Estates.

## VIII.    Waiver of stay of the Confirmation Order is appropriate under the circumstances.

99.    Bankruptcy Rule 3020(e) provides, "An order confirming a plan is stayed until the expiration of 14 days after entry of the order, unless the Court orders otherwise."  The Debtors submit that good cause exists to waive any stay of the order confirming the Plan, so that such confirmation order will be effective immediately upon its entry.

100.    In their Objection, the Class Action Plaintiffs allege that the Debtors are using the confirmation process to, among other things, "frustrate fundamental principles of the Bankruptcy Code," disenfranchise the Class Action Plaintiffs, and obtain improper releases.  *See* Objection at ¶ 70.  The Class Action Plaintiffs further allege that, "[i]n the near term, however, a stay will not harm the Debtors' estate." *Id.*

101.    First, contrary to the contentions of the Class Action Plaintiffs, the confirmation hearing and the date of entry of the Confirmation Order are a central component to a number of moving pieces in these subchapter V cases.  First and foremost, the Cerovene Agreement requires entry of the Confirmation Order no later than September 14, 2023.  As set forth above, absent the Cerovene Agreement, Cerovene and DRL will reassert their collective claims asserted at $110 million, significantly decreasing any *pro rata* distribution to the other creditors, including the Class Action Plaintiffs.  Not only that, voiding the Cerovene Agreement will cause the Debtors to incur significant expenses to litigate these claims in an adversary proceeding, further diminishing the pool of funds available to the Debtors' creditors.

102.    Second, the EGM scheduled for September 19, 2023 to elect new directors is critically tied to the Debtors' ability to consummate the Plan on an expedited basis.  Finally, any delay in consummating the Plan will cause the Debtors to continue to incur administrative costs and cause further burn of Estate funds that could otherwise be used to fund the development of

ORL-101.  Accordingly, there is ample cause to waive the stay under Bankruptcy Rule 3020(e)

and overrule the Class Action Plaintiffs' request for a stay pending appeal.

## IX.    Conclusion

103.    For the foregoing reasons, the Debtors respectfully request that the Court enter

an order, in the form of order to be filed shortly:

    a.  Confirming the Plan on a final basis pursuant to section 1191 of the Bankruptcy Code;

    b.  Overruling any objections to confirmation of the Plan;

    c.  Approving the settlement agreements set forth in the Plan under Bankruptcy Rule 9019;

    d.  Approving the form of Ballots and solicitation procedures utilized in connection therewith;

    e.  Approving the assumption of the Executory Contracts set forth on the Debtors' Assumed Contracts Schedule;

    f.  Authorizing the Debtors' to consummate the Eton Agreement and assume and assign the contracts listed thereunder pursuant to sections 363, 365, and 1123(a) of the Bankruptcy Code;

    g.  Approving the release, exculpation, and injunction provisions set forth in the Plan; and

    h.  Granting such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated: September 12, 2023
       Wilmington, Delaware

**DLA PIPER LLP (US)**

/s/ *Matthew S. Sarna*
R. Craig Martin (DE No. 5032)
Matthew S. Sarna (DE No. 6578)
1201 North Market Street
Wilmington, Delaware 19801
Tel: (302) 468-5700
Fax: (302) 397-2336
Email: craig.martin@us.dlapiper.com
       matthew.sarna@us.dlapiper.com

-and-

John K. Lyons (admitted *pro hac vice*)
444 West Lake Street, Suite 900
Chicago, Illinois 60606-0089
Tel: (312) 368-4000
Fax: (312) 236-7516
Email: john.lyons@us.dlapiper.com

*Counsel to the Debtors*